Laura **HOLLISTER**, Plaintiff,

v.

**DAYTON HUDSON CORPORATION**, a foreign corporation, Defendant.

Civil Action No. 96–73142.

United States District Court, E.D. Michigan, Southern Division.

May 12, 1998.

Robert P. Lynn, Jr., Mineola, NY, Harvey Chayet, Thurswell, Chayet & Weiner, Southfield, Gary C. Rogers, Fraser, Trabilcock, David, Lansing, MI, Steven P. Handler, Charles M. Gering, McDermott, Will & Emery, Chicago, IL, for Plaintiff.

William J. Eaton, Rice, Galin & Traurig, Southfield, MI, for Defendant, Ralph Lauren.

Dennis M. Goebel, Harvey, Kruse, Troy, MI, for Defendant, Dayton Hudson Corp.

### *OPINION AND ORDER*

FEIKENS, District Judge.

## I. INTRODUCTION

 This is a design defect product liability case. To resolve its central issue, I must apply Michigan's risk-utility test, a test which balances the magnitude of risk in the use of a product with the utility of use of that product. The Michigan Supreme Court adopted the risk-utility test for design defect product liability cases in the landmark decision, *Prentis v. Yale Mfg. Co.*, 421 Mich. 670, 365 N.W.2d 176 (1984). "Thus we adopt, forthrightly, a pure negligence, risk-utility test in products liability actions against manufacturers of products, where liability is predicated upon defective design." *Id.* at 691, 365 N.W.2d 176.

### A. Reasoning behind Michigan courts' adoption of the risk-utility test.

The court in *Prentis* noted that
while courts have accepted the social policy rationale that those injured by defective

products should be compensated for their injuries ... and have agreed that manufacturers can most effectively distribute the costs of injuries, they have never gone so far as to make sellers insurers of their products and thus absolutely liable for any and all injuries sustained from the use of those products.

*Prentis,* 421 Mich. at 682–83, 365 N.W.2d 176.[1] The court observed that questions relating to design defects and determinations when a product is not reasonably safe because of its design are "the most agitated and controversial issues before the courts in the field of products liability." *Id.* at 684, 365 N.W.2d 176. Appellate courts, attempting to differentiate between various theories of recovery in design defect cases, sought to devise well-articulated distinctions. *Id.* at 685, 365 N.W.2d 176. Other courts attempted to control the scope of liability in design defect cases. *Id.* The result is several opinions in which standards for liability in design defect cases have been carefully examined by courts and debated by judges. *Id.* There are four general categories for determining the meaning of defect in design defect cases: (1) the risk-utility analysis (associated with Dean Wade[2]), which focuses upon whether a manufacturer "would be judged negligent if it had known of the product's dangerous condition at the time it was marketed," (2) a comparison of risk and utility of the product at the time of trial, (3) a consumer expectations analysis, and (4) a combination of the risk-utility and consumer-expectations tests. *Id.* at 685–86, 365 N.W.2d 176 (citations omitted). The court in Prentis noted that "the overwhelming consensus among courts deciding defective design cases is in the use of some form of risk-utility analysis." *Id.* at 686, 365 N.W.2d 176. It stated that the risk-utility analysis in the design defect context always involves assessment of decisions made by manufacturers when designing their products. *Id.* at 686–87, 365 N.W.2d 176. It observed that the law stands as a watchdog to ensure that manufacturers' product design

decisions do not expose product users to *unreasonable* risk of injury. *Id.* at 687, 365 N.W.2d 176 (emphasis added, citation omitted).

Thus, in design defect product liability cases courts seek to satisfy the societal goal of holding manufacturers and sellers accountable for the safety of their products by striking a balance between tort liability and strict liability for physical injury caused by products. *Prentis,* 421 Mich. at 681, 365 N.W.2d 176. "From their earliest application, theories of products liability have been viewed as **tort doctrines** which should not be confused with the imposition of absolute liability." *Id.* at 682, 365 N.W.2d 176 (emphasis added). These theories are not strict liability theories. They do not impose liability without fault. "[A] plaintiff relying upon the rule [in product liability cases] must prove a defect attributable to the [manufacturer's product] and causal connection between that defect and the injury or damage of which he complains. When able to do that, then and only then may he recover against the manufacturer of the defective product." *Id.* (citing *Piercefield v. Remington Arms Co.,* 375 Mich. 85, 98–99, 133 N.W.2d 129 (1965)).

Michigan cases clearly do not say that simply because a plaintiff suffers a severe injury when using a product that liability must be imposed on the manufacturer of that product, *i.e.,* strict liability. Similarly, Michigan product liability cases do not infer negligence, based on severity of injury. Michigan cases do not impose on manufacturers the obligation to foresee all possible injury from their products. Society benefits most when product users bear appropriate responsibility for their use of products. Careless users of products should not be subsidized by more careful users through payment of higher product prices because of claims against manufacturers. The court in *Prentis* struck a balance between traditional negligence and strict liability when it adopted the risk-utility test to distribute burdens fairly between

---

**1.** "Manufacturers are not insurers that 'in every instance and under all circumstances no injury will result from the use' of their products." *Owens v. Allis–Chalmers Corp.,* 414 Mich. 413, 432, 326 N.W.2d 372 (1982) (quoting *E. I. Du Pont De*

*Nemours & Co. v. Baridon,* 73 F.2d 26 (8th Cir. 1934)).

**2.** *See* Wade, *On the Nature of Strict Tort Liability for Products,* 44 MISS. L.J. 825, 834–35 (1973).

users and manufacturers of products. *Id.* at 690–91, 365 N.W.2d 176.

### B. Michigan law parallels the Proposed Restatement (Third).

Although Michigan has not adopted the Proposed Final Draft of the Restatement (Third) of Torts: Product Liability § 2 (April 1, 1997), the Michigan risk-utility test is consistent with the principles of section 2(b), which states:

> A product: ... (b) is defective in design when the **foreseeable risks of harm** posed by the product could have been reduced or avoided by the adoption of a **reasonable alternative design** by the seller or other distributor, or a predecessor in the commercial chain of distribution, **and** the omission of the alternative design renders the product not reasonably safe;

RESTATEMENT (THIRD) OF TORTS: PRODUCT LIABILITY § 2 (Proposed Final Draft, 1997) (emphasis added). The reasoning in Michigan cases is consistent with the reasoning detailed in Comment a. to this section. Comment a. states that because design defects cannot be determined by reference to the manufacturer's standards (those being the very standards plaintiffs attack as unreasonable), "[s]ome sort of **independent assessment of advantages and disadvantages,** to which some attach the label 'risk-utility balancing,' is necessary. Products are not generically defective merely because they are dangerous." RESTATEMENT (THIRD) OF TORTS: PRODUCT LIABILITY § 2 (Proposed Final Draft, 1997), cmt. a. This comment states that trade-offs are necessary to determine costs more fairly and efficiently borne by those who incur them, and costs better borne by products users and consumers as a group through liability imposed on product sellers, with subsequent reflection of this liability in product prices. *Id.*

> Society benefits most when the right, or optimal, amount of product safety is achieved. From a fairness perspective, requiring individual users and consumers to bear appropriate responsibility for proper product use **prevents careless users and**

consumers **from being subsidized by more careful users and consumers, when the former are paid damages out of funds to which the latter are forced to contribute through higher product prices.**

*Id.* (emphasis added). In a fair and efficient liability system, the balancing of risks and benefits "in judging product design" must be done "in light of the knowledge of risks and risk-avoidance techniques **reasonably attainable at the time of distribution**" of the product. *Id.* (emphasis added).

### C. Distributor/seller liability is the same as manufacturer liability.

██ This suit is against a distributor/seller of a product. In a design defect product liability case, a distributor's liability is the same as the manufacturer. *Gregory v. Cincinnati Inc.,* 450 Mich. 1, 34–35, 538 N.W.2d 325 (1995).

## II. CHOICE OF LAW

██ Plaintiff Laura Hollister's injury occurred in Illinois. When she filed this case, Hollister was (and still is) a Michigan citizen domiciled in Ingham County. Defendant Dayton Hudson Corporation (Hudson) is a foreign corporation doing continuous business in Michigan.[3] This court has diversity jurisdiction pursuant to 28 U.S.C. § 1332. Venue is proper under 28 U.S.C. §§ 1391(a)(3) & (c). Thus, the substantive law of Michigan, including its choice of law rules, must be applied. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 74–77, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Michigan's *lex fori* rule for deciding choice of law issues in tort cases, as delineated in *Sutherland v. Kennington Truck Serv., Ltd.,* 454 Mich. 274, 562 N.W.2d 466 (1997); *Olmstead v. Anderson,* 428 Mich. 1, 400 N.W.2d 292 (1987); and *Sexton v. Ryder Truck Rental, Inc.,* 413 Mich. 406, 320 N.W.2d 843 (1982), requires this.

---

**3.** Laura Hollister's mother, Diane Hollister, allegedly purchased the blouse involved in the accident at the Hudson store in the Meridian Mall in Michigan in either 1988 or 1989.

### III. MICHIGAN'S PURE RISK-UTILITY TEST

■ In a design defect product liability case a plaintiff must show that the action is based on a design defect. *Prentis,* 421 Mich. at 682–83, 365 N.W.2d 176. Recovery for an injury caused by a defect in a product may be obtained if the product's design, the result of an intentional design decision of the manufacturer, is not sufficiently safe. *Id.*

■ *Owens v. Allis–Chalmers Corp.,* 414 Mich. 413, 326 N.W.2d 372 (1982), and *Reeves v. Cincinnati, Inc.,* 176 Mich.App. 181, 439 N.W.2d 326 (1989), are important cases in the evolution of the Michigan risk-utility test. In *Owens,* the Michigan Supreme Court stated that in order to state a prima facie case in a design defect product liability action, a plaintiff must present evidence as to both the magnitude of foreseeable risk involved in use of the allegedly defectively designed product and the reasonableness of a proposed alternative (safer) design. *Owens,* 414 Mich. at 429, 326 N.W.2d 372. Following *Owens* and *Prentis,* the court in *Reeves* stated:

[A] prima facie case of a design defect premised upon the omission of a safety device requires first a showing of the magnitude of foreseeable risks, including the likelihood of occurrence of the type of accident precipitating the need for the safety device and the severity of the injuries sustainable from such an accident. It [also] requires a showing of alternative safety devices and whether those devices would have been effective as a reasonable means of minimizing the foreseeable risk of danger. This latter showing may entail an evaluation of the alternative design in terms of its additional utility as a safety measure and its trade-offs against the costs and effective use of the product.

*Reeves,* 176 Mich.App. at 187–88, 439 N.W.2d 326 (citation omitted).

Under Michigan's risk-utility test, a plaintiff does not establish a prima facie case of product design defect if evidence of a reasonable alternative design, available and practicable at the time of distribution of defendant's product, is not produced. *Owens,* 414 Mich. at 429–30, 326 N.W.2d 372. Thus, in *Scott v. Allen Bradley Co.,* 139 Mich.App. 665, 671, 362 N.W.2d 734 (1984), the court

said, "*Owens* established that the plaintiff [in a design defect case] must present evidence concerning the magnitude of the [foreseeable] risks involved and the reasonableness of any proposed alternative design."

■ The court in *Owens* considered whether a forklift machine designed without seatbelts was defectively designed. Evidence showed that seatbelt modification would minimally affect design and utility, and present minimal cost to the manufacturer. However, testimony from forklift drivers revealed that even if seatbelts were installed on the forklifts, most drivers would not use them. The court then stated:

Our conclusion that the plaintiff did not present a prima facie case [of design defect] is based on the lack of evidence concerning both the magnitude of the risks involved and the reasonableness of the proposed alternative design. Although from the testimony of plaintiff's expert one might infer that a forklift rollover and the injuries resulting from being pinned under the overhead protective guard were foreseeable, neither his testimony nor any other evidence on the record gave any indication **how likely such an event might be.** In conjunction with this **uncertainty,** the record also produces no indication how the use of any of the driver restraints would affect a forklift operator's ability to do his or her job or the operator's safety in other circumstances.... Even if this Court could take judicial notice that the costs involved in attaching a seat belt or other designated restraint to a forklift would not be great, **we cannot take judicial notice that their use by forklift drivers would be likely, practical, or more safe.**

*Owens,* 414 Mich. at 429–30, 326 N.W.2d 372 (emphasis added). Thus, in the application of the risk-utility test, a court must also evaluate the **product user's** decisions and actions, and determine the user's contribution to the injury.

*Reeves* summarized the elements of a prima facie case where a failure to provide adequate safety devices is alleged in a design defect action: the plaintiff must show (1) the magnitude of the foreseeable risks (including

(a) the **likelihood of the occurrence of the type of accident that precipitates the need for the safety device,** and (b) the severity of the injuries sustainable from such an accident), (2) an alternative safety device available and practicable at the time of distribution of the defendant's product, and (3) whether that device would have been effective as a **reasonable means** of minimizing the foreseeable **risks** of danger from the defendant's product (including evaluation of additional utility as a safety measure, additional cost, effect on consumer/user desired features, functionality, convenience, and any other features that drive consumer demand for and acceptance of the product). *Reeves,* 176 Mich.App. at 187–88, 439 N.W.2d 326 (1989) (emphasis added).

### A. What the plaintiff must show in this design defect product liability case.

Three cases, *Owens, Prentis,* and *Reeves,* require that the plaintiff produce evidence which shows:

(1) that the severity of her injury was foreseeable by the manufacturer;

(2) that the likelihood of occurrence of her injury was foreseeable by the manufacturer; at the time of distribution of the product:

(3) that there was a reasonable alternative design available;

(4) that the available reasonable alternative design was practicable;

(5) that the available and practicable reasonable alternative design would have reduced the foreseeable risk of harm posed by defendant's product; and

(6) that omission of the available and practicable reasonable alternative design rendered defendant's product not reasonably safe.

She must show that a reasonable alternative design, available and practicable at the time of distribution of the product at issue, at reasonable cost, would have reduced the foreseeable risks of harm posed by the product, **and** that omission of the alternative design by the seller or seller's predecessor in the chain of distribution rendered the product not reasonably safe.

### IV. BACKGROUND

During the early morning hours of November 5, 1995, plaintiff Laura Hollister (Hollister) sustained a severe burn injury. She alleges that a blouse she wore at the time of her accident caused her injury, that her mother purchased the blouse 6–7 years prior to the accident at a Hudson store, and that the blouse was unreasonably dangerous due to a design defect that caused the blouse to burn in an explosive manner.

On November 4, 1995, Hollister, then a graduate student at Northwestern University, went to a party near her home in Evanston, Illinois at approximately 11:00 p.m. Diarmuid O'Connell (O'Connell), a friend who walked Hollister from the party to Hollister's apartment, states she left the party intoxicated at approximately 1:45 a.m. on November 5, 1995. O'Connell states he left Hollister's apartment some time after 2:00 a.m., approximately 15–20 minutes after he and Hollister reached the apartment. Thereafter, apparently while alone in her apartment, Hollister sustained third degree burns to more than half her body. Medical care for her injury began when paramedics arrived at Hollister's apartment at approximately 10:30 a.m. the same day.

Hollister told one of the paramedics who attended her at her apartment that she was injured in a stove fire. Other than that she remembers nothing as to the party or the accident, until approximately 9:30 a.m. on November 5, 1995, the day after the party, when she looked in a mirror, and realized she was injured. She then called her parents at their home in East Lansing, Michigan. Hollister's parents phoned Jerome Joliet (Joliet), a friend who lived near Hollister. Joliet went to Hollister's apartment and, upon discovering her injured condition, immediately phoned for emergency medical service.

The Evanston Fire Department theorizes that the fire started in the kitchen, and that Hollister's blouse apparently ignited on an electric stove burner while she was cooking some food. The United States Bureau of Alcohol, Tobacco, and Firearms (BATF) investigated the fire at the Evanston Fire Department's request. The BATF report notes

that firefighters who assisted the ambulance crew on November 5, 1995 observed the right front and right rear burners of Hollister's electric stove were still red hot. Examination of remnants of the blouse Hollister wore indicates it was made of 100% rayon. The remnants of the blouse do not indicate manufacturer or retailer identity.

The BATF report concluded that the cause of the fire was the ignition of Hollister's blouse by a stove burner while she was cooking. It also indicates that the investigator arrived at this hypothesis as to Hollister's actions, in part, by interviewing Hollister and having her reenact her movements.

Hollister sustained third degree burns to 55% of her body (virtually all of her upper body), and lost her nose, ears, chin, breasts, and most of her left thumb because of extensive injury to these areas. She has undergone, and continues to undergo, reconstructive surgery. She states she has incurred over $980,000.00 in medical expenses, and expects to incur substantial additional medical expenses. She seeks damages for necessary medical care; loss of work capacity and income; physical pain and suffering; mental anguish, fright, shock, and humiliation; mortification and embarrassment; disability and body disfigurement; and loss of social and recreational opportunities.

## V. ISSUES

Before me are Hudson's motions for summary judgment based on issues of (1) magnitude of foreseeable risks and effectiveness of alternative design, (2) causation and product defect, and (3) failure to warn. Summary judgment must issue when there is no genuine issue as to any material fact, based on the pleadings, depositions, answers to interrogatories, and admissions of the parties, together with any affidavits. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Hudson has the burden of proving there is no genuine issue of material fact. *Id.* Once Hudson meets this burden, Hollister "must set forth specific facts showing that there is a genuine issue

for trial." FED. R. CIV. P. 56(e). She must present more than a scintilla of evidence, and more than mere assertions of fact. In this opinion I point out instances in which Hollister has "failed to prove" or has "failed to show" certain facts. By using these terms I indicate that Hollister has not met the *Celotex* standard.

Because Michigan law requires application of the risk-utility test in design defect product liability cases, Hollister, to defeat summary judgment, must make out a prima facie case of design defect. Thus, the central issue: does Hollister present the proof required to meet the six elements of the Michigan risk-utility test listed in Section III(A), *supra?*

## VI. ANALYSIS

### A. Hollister's evidence applied to the elements of the risk-utility test.

During the hearing on Hudson's summary judgment motions I asked the parties to comment whether it is necessary for the plaintiff to produce proof which shows:

(1) that the severity of her injury was foreseeable by the manufacturer;

(2) that the likelihood of occurrence of her injury was foreseeable by the manufacturer; at the time of distribution of the product:

(3) that there was a reasonable alternative design available;

(4) that the available reasonable alternative design was practicable;

(5) that the available and practicable reasonable alternative design would have reduced the foreseeable risk of harm posed by defendant's product; and

(6) that omission of the available and practicable reasonable alternative design rendered defendant's product not reasonably safe.

I also asked the parties to indicate what evidence is available to respond to each of these questions. The analysis that follows discusses the controlling case law and the parties' responses to this query.

### 1. Was the severity of Hollister's injury foreseeable by the manufacturer?

Hollister does not answer this question. She cites *Reeves* to support her assertion that the burden is on the manufacturer to take reasonable care in light of reasonably foreseeable uses of the product. She fails, however, to recognize *Reeves* language that quite clearly delineates her burden:

> Whether an alleged design defect is actionable under theories of negligence and implied warranty is decided with reference to the risk-utility balancing test. *Prentis, supra.* The precise **burden on plaintiff** was delineated by the Supreme Court in *Owens v. Allis–Chalmers Corp.,* 414 Mich. 413, 326 N.W.2d 372 (1982) .... To summarize, **a prima facie case of a design defect** premised upon the omission of a safety device **requires** first **a showing of the magnitude of foreseeable risks, including** the **likelihood of occurrence** of the type of accident precipitating the need for the safety device and the **severity of the injuries sustainable from such an accident.**

*Reeves,* 176 Mich.App. at 185–87, 439 N.W.2d 326 (emphasis added). Hudson cites this passage in support of its answer that plaintiff is required to prove that the severity of her injury was foreseeable by the manufacturer.

■ Hollister admits, indirectly, that she is required to meet the "severity test," and cites *Zettle v. Handy Mfg. Co.,* 998 F.2d 358 (6th Cir.1993), in support of her assertion that once a plaintiff demonstrates that the type of injury suffered was foreseeable, the severity test becomes easier for the plaintiff to meet. The court in *Zettle* also states, however, that a "plaintiff [is] required to show the magnitude of risks foreseeable by defendant manufacturer ... **including** the likelihood of [the type of injuries sustained by plaintiff] **and the severity of such injuries.**" *Id.* at 362 (emphasis added). Hollister does not show that she has proof that the severity of her injury was foreseeable by the manufacturer at the time of manufacture.

She states, nonetheless, that she can prove that it was foreseeable that she would suffer a severe burn injury. She quotes language from a United States Consumer Product Safety Commission (CPSC) study stating that burns, particularly burns involving clothing, result in serious and painful injuries.[4] She presents a videotape in which her expert, David Hall (Hall), shows an exemplar blouse (non-identical to the blouse involved in the accident) that burned after contact with a hot electric stove burner, and shows other fabrics not burning, or not burning as quickly, as the exemplar blouse.

Hudson notes that Hollister does not present evidence showing that it was foreseeable by the manufacturer that she would sustain such a severe injury. Hudson states that Hollister's expert admitted that he could not offer proof on the nature of the injury likely to occur as a result of the alleged defect in the blouse. It points out that there is a wide range of possible outcomes following clothing ignition, and that despite the fact that clothing may catch fire, many such fires can be easily controlled or quickly extinguished. The fact that certain fabrics burn faster than others when placed in contact with a hot stove burner does not prove that the severity of Hollister's injury was foreseeable by the manufacturer. Hudson observes, and I agree, that Hollister submits no proof that the severity of the injury she sustained was foreseeable by the manufacturer.

### 2. Was the likelihood of occurrence of Hollister's injury foreseeable by the manufacturer?

Hollister states that Michigan law requires a manufacturer to design its product so as to eliminate any unreasonable risk of foreseeable injury. *Prentis,* 421 Mich. at 692–93, 365 N.W.2d 176. She fails, however, to mention the court's language immediately following her cited passage that states that "a **design defect is established by proof that the product is not reasonably safe for the uses intended, anticipated, or reasonably foreseeable.**" *Id.* at 693, 365 N.W.2d 176

4. DEBORAH K. TINSWORTH, U.S. CONSUMER PROD. SAFETY COMM'N, HAZARD DATA RELATED TO THE FLAMMABILITY OF WEARING APPAREL (1985).

(emphasis added, citation omitted). Hollister then repeats her "crux of liability" argument.

Hudson replies:

> The precise **burden on plaintiff** was delineated by the Supreme Court in *Owens v. Allis–Chalmers Corp.*, 414 Mich. 413, 326 N.W.2d 372 (1982) .... To summarize, **a prima facie case of a design defect** premised upon the omission of a safety device **requires** first a showing of the magnitude of foreseeable risks, **including the likelihood of occurrence of the type of accident precipitating the need for the safety device and the severity of the injuries sustainable from such an accident.**

*Reeves,* 176 Mich.App. at 185–87, 439 N.W.2d 326 (emphasis added); *see also Zettle,* 998 F.2d at 362; *Kirk v. Hanes Corp. of North Carolina,* 16 F.3d 705 (6th Cir.1994); *Allen v. Verson Allsteel Press,* 957 F.2d 275 (6th Cir.1992); *Siminski v. Klein Tools, Inc.,* 840 F.2d 356 (6th Cir.1988).[5] In its response to this question, Hudson cites *Fisher v. Kawasaki Heavy Indus., Ltd.,* 854 F.Supp. 467 (E.D.Mich.1994), which notes that a plaintiff in a design defect case must present evidence as to the likelihood (the probability) of occurrence of the type of injury plaintiff sustained, determined by how often the injury occurs with use of that product. *Id.* at 470–71. Hudson notes that Hollister's expert admitted that he could not give an opinion on the frequency of clothing burn injuries during either of the two years in which Hollister's mother may have purchased the blouse. Instead, Hollister turns to a report from the Consumer Product Safety Commission to support her assertion that the likelihood of occurrence of her injury was foreseeable by the manufacturer.

█] Hollister must show that the likelihood of the occurrence of her injury was foreseeable by the manufacturer. She states it was foreseeable that her injury was likely to occur. She states that the blouse was dangerously flammable (based on her expert's testing of a non-identical exemplar blouse), and that it was foreseeable that a

woman's blouse could be brought near sources of heat, including stove burners. But such conclusory statements do not constitute proof of foreseeability by the manufacturer of the likelihood of her injury. She must present proof that the type of injury she sustained occurs so commonly that it is reasonably foreseeable.

Hollister returns to the CPSC study for the statistic that an average of 3,200 clothing-related burn injuries were reported during each of the years the study covered. However, the same study notes that only 55% of these injuries were associated with "daywear," and only 40% of the daywear associated injuries were shirt/blouse associated. In other words, on average, only 704 shirt/blouse associated burn injuries occurred per year during the study years. Over 47% of the shirt/blouse associated injuries occurred in children under age 15 or adults over age 65. On average, only 373 shirt/blouse associated injuries per year occurred in the larger epidemiologic group including Hollister's age group. Finally, only 23–33% of the shirt/blouse associated burn injuries in that group were severe enough to require hospitalization, resulting in a total of only 123 shirt/blouse injuries per year, in Hollister's epidemiologic group, that might possibly match the severity of her injury. These figures are from the same CPSC study Hollister relies on in her pleadings. In the United States of America, a country with a population of over 245 million people in 1988 and over 247 million people in 1989, these are small numbers indeed.[6] Hollister fails to present proof that the likelihood of occurrence of her injury was foreseeable.

### 3. At the time of distribution of the blouse, was a reasonable alternative design available?

Hollister answers that in a design defect case plaintiff may recover even if she does not prove that a reasonable alternative design existed at the time of manufacture of the product. She cites *Prentis,* 421 Mich. at

---

5. Additionally, eight unpublished Sixth Circuit opinions that address the risk-utility test are consistent with these published cases.

6. Economics And Statistics Administration, Bureau Of The Census, U.S. Dep't Of Commerce, Statistical Abstract Of The United States 8 (117th ed.1997).

688, 365 N.W.2d 176, to support this assertion. But this section of the *Prentis* opinion simply provides the court's review of the law concerning manufacturers' liability for design defects in many states. In subsequent language, the court states "[W]e adopt, forthrightly, a pure negligence, risk-utility test in products liability actions against manufacturers of products, where liability is predicated upon defective design." *Id.* at 691, 365 N.W.2d 176. As Hudson noted, the court in *Reeves* explained:

> [A] prima facie case of a design defect ... secondly **requires a showing of alternative safety devices and whether those devices would have been effective as a reasonable means of minimizing the foreseeable risk of danger.**

*Reeves,* 176 Mich.App. at 187–88, 439 N.W.2d 326 (emphasis added).

Hudson answers that although Hollister's expert did burn testing, she did not submit proof as to when the proposed alternative fabrics were manufactured, or whether such fabrics were available at the time of distribution of the blouse involved in this case. It also notes that Hollister has not submitted proof that alternative rayons were available that would have been significantly safer than the blouse involved in the accident.

■ Here, the "safety device" is the fabric of the blouse itself. Hollister must show that, at the time of distribution of the blouse involved in her accident, a reasonable alternative design was available. She states that the sample fabrics her expert tested were available at the time of distribution of the blouse, and that they were reasonable alternatives to the design of that blouse. She purports to prove this through tests in which her expert, David Hall, used and observed different fabrics for ignition and burning time when he moved them across the top of an electric stove burner. However, dramatic though they may be, Hall's burn tests do not prove that any of Hollister's proposed designs would have been reasonable alternatives (i.e., safer than the blouse she wore during the accident) under the circumstances in which she sustained her injury. Hollister has not shown that any of her proposed alternatives are indeed reasonable alterna-

tive designs. Therefore, she has not shown that a reasonable alternative design was available at the time of distribution of the blouse involved in the accident.

**4. At the time of distribution of the blouse, was a reasonable alternative design practicable?**

Both Hollister and Hudson admit that Hollister must show that, at the time of distribution of the blouse Hollister wore in the accident, a reasonable alternative design was practicable. Hudson cites *Owens,* 414 Mich. at 429, 326 N.W.2d 372, and *Fisher,* 854 F.Supp. at 471–72, in support of its affirmative answer. Hollister asserts that her proposed alternative designs were not only practicable, but actually in use at the time of distribution of the blouse involved in the accident. Even if her alternative designs were actually in use at the time of distribution of the blouse, Hollister has not shown that her proposed alternative designs are reasonable. Hudson notes that Hollister presents no proof on the effect that any of Hollister's proposed alternative designs would have on aesthetic quality, feel, fit, wear, longevity, maintenance, repair, costs, or marketability of the blouse involved in the accident. Thus, Hudson asserts, and I agree, that Hollister has not shown that reasonable alternative designs were practicable at the time of distribution of the blouse.

**5. At the time of distribution of the blouse, would the available and practicable reasonable alternative design have reduced the foreseeable risk of harm posed by the blouse?**

■ Both Hudson and Hollister admit that Hollister must show that, at the time of distribution of the blouse, an available and practicable reasonable alternative design would have reduced the foreseeable risk of harm posed by the blouse. Hollister states that the burn tests performed by her expert meet this burden. Hudson observes that the court in *Zettle,* a case involving fatal electrocution of a farmer while using an industrial power washing machine, noted that the plaintiff in a design defect case must demonstrate that her proposed alternative design "would

have been effective as a reasonable means of minimizing the foreseeable risk of danger." *Zettle*, 998 F.2d at 362. As discussed earlier, Hollister has not demonstrated that the risk of sustaining her injury was foreseeable by the manufacturer. Hudson points out that Hollister's expert stated that he could not articulate the exact effect on flammability of the changes Hollister claims would make the blouse safer. The expert admitted that the expected effect was too speculative. Hollister fails to present evidence to show that, under otherwise identical circumstances, she would not have sustained the same injury while wearing a blouse made with one of her proposed alternative design fabrics.

### 6. Did omission of the available and practicable reasonable alternative design render the blouse not reasonably safe?

Hollister answers that she need not show that omission by the manufacturer of an available and practicable reasonable alternative design rendered the blouse she wore not reasonably safe. She provides no case law to support her assertion. She simply states that the blouse was not reasonably safe, and that if the blouse was made from one of her proposed alternative designs her severe injury would not have occurred. However, the court in *Zettle* noted that although the plaintiff in that case presented evidence of a reasonable alternative design, because the plaintiff did not prove that omission of the proposed reasonable alternative design resulted in decedent's injury, the plaintiff did not satisfy the requirements of the Michigan risk-utility test. *Zettle*, 998 F.2d at 362. Hollister has not shown that wearing one of the alternative design blouses would have prevented her injury, and she has not shown that omission, by the manufacturer of the blouse she wore, of her proposed

available and practicable reasonable alternative designs rendered the blouse in question not reasonably safe.[7] I cannot take judicial notice that one of Hollister's proposed alternative designs would be safer than the blouse involved in the accident.

### B. Hollister fails the Michigan risk-utility test.

Hollister fails to present the proof required by the risk-utility test. Proof as to each of the elements of the test is necessary. That she was not able in this case to procure this proof through discovery, or through expert witnesses or technical data, or because no information exists as to the identity of the manufacturer, is answered by *Siminski v. Klein Tools, Inc.*, 840 F.2d 356 (6th Cir.1988). The court in *Siminski*, a case involving a carpenter's claim that the belt he wore was too narrow, and that this design defect was the cause of the fall that injured him, noted:

> Unlike manufacturing defects, design defects result from deliberate and documentable decisions on the part of manufacturers, and plaintiffs should be able to learn the facts surrounding these decisions through liberalized modern discovery rules. Access to expert witnesses and technical data are available to aid plaintiffs in proving the manufacturer's design decision was ill considered.

*Siminski*, at 358 (citing *Prentis*, 421 Mich. at 689, 365 N.W.2d 176). Because Hollister cannot present a prima facie case of design defect, Hudson is entitled to summary judgment as a matter of law.

### C. Other considerations in the court's analysis.

Other considerations in the evaluation of Hollister's evidence are (1) that blouses and stoves are so generally available and widely

---

**7.** Hollister's difficulty in meeting the requirements of the risk-utility test to establish a prima facie case of design defect is compounded by the paucity of evidence presented regarding the blouse itself. Hollister presented no independent evidence of who the blouse manufacturer was or the year the blouse was manufactured. Although Hollister's mother stated she purchased the blouse at a Hudson store in the Meridian Mall six to seven years prior to the accident, neither Hud-

son nor Hollister has any written record of the purchase.

The weight of evidence that the blouse was purchased at a Hudson store is also problematic. In her deposition testimony, Hollister's mother stated emphatically that the blouse was made of 100% cotton. However, when tested, the blouse remnants were shown to be composed of 100% rayon.

used by adults that instructions or warnings about the dangers of igniting a blouse on a hot stove burner are not necessary, even if the blouse involved in the accident posed significant risk of harm; (2) that the danger posed by using clothing directly over a hot stove burner is an open and obvious danger known to a reasonable adult; (3) that a reasonable adult would expect a blouse to burn if placed on a hot stove burner and thus would avoid doing so; (4) that by placing clothing in contact with a hot stove burner, an adult is misusing the clothing; and (5) that careless users of clothing should not be subsidized by more careful users of clothing by the cost of claims against manufacturers being passed on to more careful users through increased product prices.

## CONCLUSION

For the reasons stated herein, Hollister fails to present a prima facie case of design defect; thus, defendant Hudson is entitled to summary judgment as a matter of law.

*IT IS SO ORDERED.*